Stewart, J.
The questions in this case, while not simple, are not numerous, for it seems to us that if we can arrive at the intention • of John Brickell, as shown by his will, and then determine whether those ’ intentions have been carried out, we have decided the case. John Brickell died July 27, 1844, leaving a will, which was probated August 3, 1844, and the executor named therein qualified and acted as such. That will is as follows:
In the name of the Benevolent Father of All: I, John Brickell, anticipating that I must soon die, do make and publish this, my last Will and Testament, hereby revoking all others hereto made :
“ First — Unto my wife Susan, I will what the law gives her, and no more.
“ Secondly — I give and bequeath unto my daughter, Evalina Brickell, the sum of five hundred and fifty dollars, to be paid her so soon as my executor hereinafter named, can without sacrifice, in his opinion, convert any part of my estate into money for that purpose.
“ Thirdly — I give and bequeath unto my grand-daughter, Susan Brickell, the sum of four hundred dollars to be paid her as soon as my executor can without sacrifice, in his opinion, convert any part of my estate into money for that purpose.
“ Fourthly — I give and bequeath unto my son John, the house in which be now lives, and a tract of land on which the same stands, whose corners are four stones planted, to have *589 and to hold the same unto him, his heirs and assigns forever. I also give and bequeath unto my said son John, one undivided moiety of the rest and residue of my real estate, to have and to hold the same during the natural life of my said son John, and at his death my will is that said moiety of said residue be equally divided between the children of my said son John, lawfully begotten and living at the death of my said son John. I also give to my said son John, one wagon and my bay and sorrel horse, and gears for said horses.
“ Fifthly — I give and bequeath unto my son, Cyrus Brick-ell, in fee, the other undivided moiety of the rest and residue of my real estate, to have and to hold the same unto my said son Cyrus, and unto his heirs and assigns forever. I also give unto my said son Cyrus, one wagon and two gray horses, and gears for said horses.
“ Sixthly — Should my sou John think proper to remove from this quarter of the country, he may sell in fee his moiety of said residue of my real estate, provided he shall vest the proceeds in other land in the name and for the use of his children, he, my said son John, retaining and holding to his use for life, the rents and profits of said land so to be purchased, and the purchasers of said moiety of said residue to be answerable for the appropriation of the money in manner aforesaid.
Ci Seventhly — I give to my son, McLean Brickell, ten dollars to be paid out by my executor in clothing for my said son McLean.
“ Eighthly — All the rest and residue of my property, choses in action, notes of hand, money, and every thing else not above disposed of, I give in equal proportions to my daughter Eva-line, my grand-daughter Susan, and my sons Cyrus and John, to be divided between them, share and share alike.
“ Lastly — I hereby nominate and appoint Alexander Patton, Esq., to be my sole executor of this my last will and testament.”
John, the son of testator, died February 2, 1890, having survived all of his children. It appears clearly that this will was made under the apprehension that the testator would live but a short time, and with a desire to provide for his children and the grand-daughter living with him, as their needs required. So far as making any provision for his wife is concerned, her name might have been omitted. It is clear from *590 the second and third items, that having mentioned his wife, and knowing that nothing he could say would deprive her of' her rights under the law, he intended that, as soon as that law was satisfied, his grand-daughter and his daughter should be provided for ; and that they should be provided for before-anybody else except his wife. Over everybody else’s share-of his estate except his wife’s, he had perfect- control both as to amount and priority, and so made provision for the sure payment of these legacies to his grand-daughter and bis daughter. Their capacities and needs are shown by the provision that the legacies shall be paid to them “ as soon as my executor can without sacrifice in his opinion convert any part of my estate into money for that purpose.” Certain and speedy payment was the thought in the mind of the testator. That he must have known the condition of his estate is apparent, and “ anticipating,” as he says that he “-must soon die ” he could not have expected any great change therein. That the sale of his personalty realized only a little over $100 is conclusive of the fact that he did not expect that to pay the legacies. It is true that there was a note for $800, but the collection of that would hardly fall within the direction to convert into money. He knew, too, what his real estate consisted-of, and he must have known that it would be necessary to sell at least some of it to pay these .legacies. Many authorities might be cited upon what does and what does not make a legacy a charge upon real estate, but in the end this rule must govern : What was the intention of the testator looking at his will, and his whole will, and the circumstances of his property known to him at the time, of making the will ? Applying that rule to this will, and it is clear that after the widow’s share, over which heihad no control, had been taken out, he intended that whatever part of his estate was necessary should be sold to pay these legacies; knowing that his personalty was insufficient, he intended the realty should respond, and thus made them a charge upon that realty. . It is hardly worth while to discuss when, an executor may sell real estate to pay *591 legacies, in the face of an express authorization to the executor to convert any part of his estate into money to pay the legacies.' But one way exists whereby real estate can be converted into money, and reason and authority sustain the proposition that authority to convert into money, is express authority to sell; and where the authority is given by the will, what course ought to have been pursued in the absence of such express authority is unimportant. Effect can be given to the intention of the testator by holding that the executor had authority to sell the real estate described in the fourth and fifth items to pay the legacies mentioned in the second and third. By items four and five he disposed of all his real estate. He had not sufficient personalty to pay his debts, the legacies and his widow’s share, and by the first, second, third, fourth, fifth and seventh items of the will his entire estate was disposed of. We come now to the sixth item of the will which is the foundation of plaintiff’s claim, and which reads as follows :
“ Should my son, John, think proper to remove from this quarter of the country, he may sell in fee his moiety of said residue of my real estate, provided he shall vest the proceeds in other land in the name and for the use of his children, he, my said son John, retaining and holding to his use for life the rents and profits of said land so to be purchased, and the purchasers of said moiety of said residue to be answerable for the appropriation of the money in manner aforesaid.”
The evidence establishes that about fourteen months after the death of the testator his son John sold to Ur. Lincoln Qoodale, for full value, the undivided one-half of the 7J acres in fee. His deed therefor contained the following recital: “ Now said Brickell being about to remove from this part of the country, he sells this land, and after the executor of his father’s estate has paid out of the avails thereof the debts and legacies due from the estate of his late .father, John Brickell, deceased, the balance of the purchase money is to be invested in lands in the name of the children of the subscriber John Brickell, and to be for their benefit after the death of the sub *592 scriber John Brickell, agreeable to the will of his father.” That this power of sale was given for John’s benefit is clear from the language of this item. It is to be exercised when he thinks proper; and the re-investment provided for may be made where he pleases. The remaindermen could not control the sale or re-investment. Indeed this provision of the will seems to us more in the nature of a direction as to the exercise of the power than a condition to its valid exercise. Whenever John thought proper to remove, the power of sale was given him ; nobody could know when this time came except from John’s declarations, and here we find them made in the very instrument conveying the property. That the removal should be instantaneous is a reductio ad absurdum. John declared to the purchaser of this property that he thought proper to remove; this evidence of the time having arrived when, by the terms of the will he might sell the fee in this land, being furnished by the only competent witness, the execution of the deed to Goodale was in the exercise of the power given him by the will. But it is said this declaration of John’s intention is negatived by his acts. If such refusal -to act on the part of John after his declaration of his intention to the purchaser can relate back so as to affect the title of the purchaser, it becomes necessary to examine the evidence to see what he did do. John was not living on this property, but in the house giyen him by his father in fee; that be need not remove immediately we have not thought necessary to discuss. As this provision was for John’s benefit, it was hardly to be expected that he would remove until he had disposed of all his realty, that the proceeds might all be invested in one place where he could live and enjoy his life estate and realize most largely from it. This most natural course was the one he pursued. About a month after selling to Goodale he sold the undivided half of another tract to Atcheson, still retaining his homestead and his- interest in t.he 4 acre tract out of which his homestead was carved, and upon which his mother resided. Then too, it must be borne in *593 mind that the proceeds of these sales were placed in the hands of the executor to pay the legacies, and thus John had nothing to re-invest, and so it was not to his interest to leave his homestead. But in November, 1846, the time arrives when he can carry out his intention to remove; this under the circumstances was a reasonable time in which he might perfect his plans ; he now sells his homestead and the undivided half of his interest in the four acre tract, and buys a farm in Mifflin township of 263 acres, and causes the same to be deeded 3-8 to his children subject to his life estate, 2-8 to himself representing his fee, and 3-8 to his brother Cyrus, who had also conveyed his interest in the four acres; here we have declared an intention to remove, followed within what we think under the circumstances a reasonable time by a removal. How far he was to remove was left to him to determine, and a removal of eight miles was a removal. So that if more than' the declared intention* was necessary, we have the other ingredient to the valid exercise of the power, to-wit: the removal.
But it is claimed further that John could hot convey the fee unless he invested the proceeds in other lands in the name and for the use of his children subject to his life estate. It is claimed that John could not sell until he was ready to invest the proceeds in other lands, etc. The reading of this will does not support such a claim. In the first place, the investment of the proceeds is left entirely to John’s discretion ; he may invest in town or country ; in one state, or another ; in one piece of real estate or in two, or a dozen. This implies that he is to have time in which to exercise this discretion, and necessarily so. Again, he is only required to invest the proceeds, and proceeds pre-supposes a sale from which proceeds have come. But the provisions of this item are further that, “ the purchaser of said moiety of said residue to be answerable for the appropriation of the money in manner aforesaid.” There can not be a purchaser until there has been a sale. The whole item show's that the testator intended that John should, having made a sale, invest the proceeds. *594 That the purchaser shall be answerable for this appropriation of the proceeds cannot be doubted, for the will expressly charges him therewith. Did John and the purchaser fail of their duty ? It is claimed on behalf of the plaintiff that the recital in the deed of John to Goodale that the money or so mnch as is necessary, shall be used to pay the legacies and debts of John Briekell, deceased, is conclusive. If the recital of this deed is to be taken as conclusive of what was done, ■how would it work when applied to the intention to remove expressed in the deed ? But what was the situation of these parties? At the time of the deed to Goodale it was apparent to the executor that there was not enough personalty to pay the debts and charges, the widow’s allowance and the legacies ; these legacies were a charge upon the land, and the executor had the power to sell the land to pay the legacies. The land was bound to be sold, and hence we may presume arose the necessity for John’s removal, and the formation of.his intention to do so expressed in his deed. And so John exercises the power given him by the will to sell the land charged with the legacies. The purchaser, we may assume, knowing this, insists and John consents that the proceeds shall go into the hands of the executor to be applied to the payment of this charge. The legacies are paid; what remains is paid to John at or near the time of the purchase of the Mifflin township land, and we are satisfied was applied in payment for that land. Thus the manifest intention of the testator is carried out j the legacies, the prior charge, are paid, and the balance invested for John’s children. It may be said that this was not strictly according to law ; that the executor ought to have exercised his power of sale, and after a lapse of more than forty years- ea; post faoto wisdom would seem to so dictate. But granting that the executor and John acted without a clear coneeption of their powers under the will, it still remains thát they did substantially exercise them, each with the consent of the other, and with the single purpose of carrying out the infion of the testator, and that the testator’s estate went exactly *595 ■Where he intended it to go. That a court of equity will never sacrifice substance to form is too well established a doctrine to need more than the statement of it. John exercised under proper circumstances the power given him, and the net proceeds of the land, and that was all that could have been invested in any event, were invested, as directed by the testator and the purchaser, and the executor saw to it that they were so invested.' This is decisive of the claim of the plaintiff. An additional circumstance in this case, and competent as throwing light upon it, is that the executor executed and delivered to Goodale a-deed for this land, executed doubtless ex abundanti cautela. While it is true that an executor cannot sell lanes to pay debts or legacies after the debts and legacies are paid, it will hardly be claimed that if an executor has sold land for that purpose, received the proceeds and paid the debts and legacies, he can not afterwards make a deed.
But there is another ground upon which it seems to us that these claimants cannot succeed in this case, arising out of estoppel as to some, and ratification as to others. We do notin this case lay much stress on the fact, which is established that these claimants lived in this city, and were in a position to know that parties were in possession of this property making such improvements as only the owners of the fee would make; for until the death of John Brickell they were not in a position to assert any claim to or control over this property. But John, who was one of the residuary legatees, and those claiming under him, are estopped by the covenants of his deed — Cyrus and those claiming under him, by his active participation in all these transactions with knowledge of what was being done, and why it was done ; and Evaline and Susan Brickell by receiving their legacies derived from the sale of this real estate. Evaline is dead, and Mrs. Dean says she did not know whence her legacy came. There is, however, testimony as to declarations that she did know. But, aside from that, the history of this transaction, taken from the deeds, the account of the executor and other circumstances, *596 coupled with the fact that from the provisions of the will, it is apparent that the testator considered these legatees old enough and capable enough to immediately receive their legacies, large as they were when we consider the time when this will was made, satisfies us that it was the result of a family arrangement, fully understood by all the parties to it, and that Evaline and Susan Brickell did know when they received their legacies that they came from the proceeds of the sale of the real estate. To find that they did not have this knowledge, would be to say that nothing could be proven in a court of justice except by direct evidence — a rule which nowhere prevails. The presumption is so strong, that they ought not to be heard to dispute it. But, after all this had occurred, we find these claimants asserting in court that the land in Mifflin Township, though claimedjby others, belonged to them because it was purchased by John Brickell under the provisions of the sixth item of this will. They invoked the judgment of a court upon their claim, and the court decided in their favor, and they have enjoyed the fruits of that contention. Thus, they have ratified the acts of John. It will not do now to say that they were only claiming so much of this land as represented the four acre lot; they claimed it all, and must be bound by whatever resulted from their assertion of their rights. This land in Mifflin Township represented all of the- interest of John and his children in the real estate given by the fourth item of the will to them. That has been decreed to them, and they or their grantees are still in possession of it, and therefore they cannot now claim that the provisions of item six were not fully complied with.
, But still another reason exists why a decree must be entered in this case in favor of the defendants in possession.
While, as we have said, we do not think there is any question as to the responsibility of the purchaser for the appropriation of the proceeds of the sale of the moiety given to John, that responsibility must be measured by the terms of the will John, by theterms of the will, had the power to sell the fee, *597 whenever he thought proper to remove. When, therefore, he thought proper to remove, and made a deed in fee simple, that carried the title to the purchaser, there being no fraud or mistake. Now arose the duty of the purchaser. He was answerable for the appropriation of the money. If John did not reinvest it, as required by the will, the responsibility of the purchaser arose. But that could not re-invest the title in John. The title had passed out of him, but the purchaser having failed to see to the proper appropriation of the proceeds would, we think, in a proper case, be responsible for the purchase price. There was no intention on the part of the testator to limit the passing of the fee, provided John had transferred it the contingency having arisen, but to see that the proceeds were preserved for the remaindermen. This viewisin accordance with reason, and is supported by authority. Webb v. Ledsam, 1 Kay & Johnson, 385; Webb v. Chisholm, 24 S. C. 487. Dr. Goodale then acquired the fee by the deed from John, executed by virtue of the power of sale given him by the will, and it follows that these claimants have no claim to the land.
E. W' Kiitredge, Nash & Lentz, Jones & Jones and Hambleion & Ciarle, for plaintiff.
Harrison, Olds & Henderson, J. T. Holmes, Marriott & Hughes and R. H. Platt, for defendant Loewenstein.
A decree will be entered for the defendants in possession, and the petition dismissed.